[No. 27714. Department One. November 18, 1939.]

THE STATE OF WASHINGTON, *on the Relation of Columbia Broadcasting Company, Plaintiff,* v. THE SUPERIOR COURT FOR KING COUNTY, *J. T. Ronald, Judge, Respondent.*[1]

[1]Reported in 96 P. (2d) 248.

*Bogle, Bogle & Gates* and *Ray Dumett,* for relator.
*Poe, Falknor, Emory & Howe,* for respondent.

MAIN, J.—This is an original application in this court for a writ of prohibition directed to the superior court of King county to prevent it from taking jurisdiction of the relator, Columbia Broadcasting Company, referred to herein as the Columbia, in an action in which it is one of the parties defendant.

The Columbia Broadcasting Company is a corporation organized under the laws of the state of New York. The Queen City Broadcasting Company, which is the other defendant in the action, is a corporation organized under the laws of this state and operates a radio broadcasting station known as KIRO, at Seattle. The Waldo Hospital Association is a corporation, also organized under the laws of this state. The Columbia was engaged, and is now engaged, in the business of operating a radio broadcasting network, which consists of the originating and furnishing of programs to radio stations of the network over program transmission lines. The Queen City is one of the stations in the network.

This network comprises approximately one hundred and ten radio stations, located in forty-five states, the district of Columbia, and the territory of Hawaii, and, in addition, certain stations located in some of the provinces of the Dominion of Canada. Of these,

the Columbia operates, directly, nine. Stations not owned or operated by the Columbia are referred to as affiliated stations. Programs are produced and originated in the Columbia's studio at its principal place of business in the state of New York. A local station may, at times, prepare programs and send them to other affiliated stations.

The stations not owned or operated directly by the Columbia are operated under a written contract, and that is the way that the Queen City is operated. The contract made by this station was entered into February 24, 1937. This contract is altogether too long to be set out in full. Only a few of its principal provisions will be referred to.

The contract recites that the Columbia is engaged in furnishing programs to radio broadcasting stations composing a part of the chain known as the Columbia broadcasting system; that the Columbia desires to use the facilities of the station as part of its chain; that the Queen City agrees to furnish the facilities of its station to the Columbia for commercial purposes; that the Columbia will be entitled to the exclusive use of the station's facilities during any hour or fraction of an hour in which, pursuant to the agreement, the facilities are furnished to the Columbia; that, so long as the Queen City operates with a certain power, the Columbia will be entitled to the use of the station's facilities for its commercial programs, for which it agrees to pay; that the Columbia will sell broadcasting time over the station; that, if it increases the rate of payment at which it sells broadcasting time over the station, it will increase the rate of payment by the Columbia to the station; that, if the Columbia shall change the rate per hour at which it sells broadcasting time over the station for network commercial programs, it will pay an increased rate to the station for

the use of its facilities; that the station shall obtain as much publicity as possible for the Columbia broadcasting system and shall use therefor such publication notices as shall be released by Columbia from time to time, as well as any available and favorable local publicity. This recital is a mere summary of the provisions of the contract which seem to us to be essential to an understanding of the relations between the parties.

The Waldo Hospital Association brought an action in the superior court and, as indicated, made the Columbia a party thereto. This action was for the purpose of recovering damages for a broadcast originating at the St. Louis affiliated station and broadcast over KIRO, which the hospital claims was defamatory. Jurisdiction was sought to be obtained over the Columbia by serving a summons and a copy of the complaint upon the general manager of station KIRO.

The question is whether that service was good, and this, in turn, depends upon whether, by reason of the terms of the contract referred to, the Columbia was doing business in this state and KIRO was its agent.

Rem. Rev. Stat., § 226 [P. C. § 8438], provides that:

"The summons shall be served by delivering a copy thereof, as follows: — . . .

"9. If the suit be against a foreign corporation or nonresident . . . doing business within this state, to any agent, . . . thereof; . . ."

The question, then, arises whether the Columbia, by reason of its contractual relations with the Queen City, was doing business in this state. The words of the statute, "any agent," were intended by the legislature to have a broad meaning, and must be liberally construed to effectuate the legislative intent. While they may not include a day laborer or an employee

who has no authority to represent the corporation in any way other than to discharge his daily task, they must be held to include all agents who represent the corporation in either a general or a limited capacity. *Barrett Mfg. Co. v. Kennedy,* 73 Wash. 503, 131 Pac. 1161; *Pacific Typesetting Co. v. I. T. U.,* 125 Wash. 273, 216 Pac. 358, 32 A. L. R. 767.

The word "business" is a comprehensive term, and embraces everything about which a person can be employed. It is that which occupies the time, attention, and labor of men for the purpose of a livelihood or profit. *Bankers Holding Corp. v. Maybury,* 161 Wash. 681, 297 Pac. 740, 75 A. L. R. 1237; *Flint v. Stone Tracy Co.,* 220 U. S. 107, 55 L. Ed. 389, 31 S. Ct. 342, Ann. Cas. 1912B, 1312. The general rule is that the business must be of such a nature and character as to warrant the inference that the corporation has subjected itself to the local jurisdiction, and is, by its duly authorized officers or agents, present within the state or district where the service is attempted. *Philadelphia & R. R. Co. v. McKibbin,* 243 U. S. 264, 61 L. Ed. 710, 37 S. Ct. 280; *People's Tobacco Co. v. American Tobacco Co.,* 246 U. S. 79, 62 L. Ed. 587, 38 S. Ct. 233, Ann. Cas. 1918C, 537.

Applying these rules to the facts in the present case, we are of the opinion that the Columbia was doing business in this state, and that the agreement under which it was operating was, in effect, a leasing of time from the Queen City. To state it otherwise, the Queen City was the lessor, and the Columbia, the lessee, and the subject matter of the lease was time for which the Columbia agreed to pay. If this be the correct construction of the contract, the Queen City would, in effect, be the agent of the Columbia. It being the agent, service of summons upon the general manager of that agent would confer jurisdiction. *Georgia*

*Power & Light Co. v. Wilson,* 48 Ga. App. 764, 173 S. E. 220.

In addition to what has been said, we desire to call attention to the case of *Fisher's Blend Station v. Tax Commission,* 297 U. S. 650, 80 L. Ed. 956, 56 S. Ct. 608. In that case, the Fisher's Blend Station owned and operated two radio stations in this state, and over these stations it broadcast programs which extended beyond the state lines. The state tax commission sought to enforce the occupation tax, measured by the gross receipts of the two stations. The question was whether the stations were engaged in interstate commerce, and upon this question the opinion of the Federal supreme court states:

"Appellant is thus engaged in the business of transmitting advertising programs from its stations in Washington to those persons in other states who 'listen in' through the use of receiving sets. In all essentials its procedure does not differ from that employed in sending telegraph or telephone messages across state lines, which is interstate commerce. *Western Union Telegraph Co. v. Speight,* 254 U. S. 17; *New Jersey Bell Tel. Co. v. State Board of Taxes,* 280 U. S. 338; *Cooney v. Mountain States Tel. & Tel. Co.,* 294 U. S. 384; *Pacific Tel. & Tel. Co. v. Washington, ante,* p. 403. In each, transmission is affected by means of energy manifestations produced at the point of reception in one state which are generated and controlled at the sending point in another. Whether the transmission is effected by the aid of wires, or through a perhaps less well understood medium, 'the ether,' is immaterial, in the light of those practical considerations which have dictated the conclusion that the transmission of information interstate is a form of 'intercourse,' which is commerce. See *Gibbons v. Ogden,* 9 Wheat. 1, 189.

"Similarly, we perceive no basis for the distinction urged by appellee, that appellant does not own or control the receiving mechanisms. The communications broadcasted are no less complete and effective, nor any the less effected by appellant, because it does not own

or command the apparatus by which they are received. The essential purpose and indispensible effect of all broadcasting is the transmission of intelligence from the broadcasting station to distant listeners. It is that for which the customer pays. By its very nature broadcasting transcends state lines and is national in its scope and importance—characteristics which bring it within the purpose and protection, and subject to the control, of the commerce clause."

If the Fisher's Blend Stations were engaged in interstate commerce, it seems to us that it must be held that the Columbia was likewise engaged in interstate commerce. If engaged in that commerce, it necessarily follows that it was doing business in this state.

The writ will be denied.

BLAKE, C. J., MILLARD, and SIMPSON, JJ., concur.

ROBINSON, J. (dissenting)—I feel constrained to record a dissent from the foregoing opinion, although due to the pressure of more direct and compelling duties, I have not had the opportunity to give the matter the intensive study which it rightly deserves.

I cannot agree that the *Fisher's Blend Station* case, so strongly relied on by the majority, is at all determinative. On the other hand, and with all due respect, I think it has little or no bearing upon the question before the court, and I assume that the attorneys for the respondent must also be of that opinion, since they do not cite the case in their briefs and, to the best of my recollection, did not refer to it on oral argument. That case holds that the Fisher's Blend Station, located in the state of Washington, and broadcasting with sufficient power to activate radio receiving sets in eleven states and two territories, is engaged in interstate commerce. But it does not hold that it is, therefore, present, and carrying on business, in those states and terri-

tories. The reasoning of that decision would compel a holding in this, that when the relator produces audio waves in New York and delivers them over telephone wires to the Queen City Broadcasting Company in Seattle, it is carrying on an interstate commerce transaction. But, since the contract between the parties was made in the state of New York, that does not compel or warrant a holding that the relator is doing business in the state of Washington in the jurisdictional sense.

It can be safely assumed that the shelves of every large department store in the state are being continuously replenished by goods flowing in from almost every other state in the Union. The firms which sell these goods to the local merchants and ship them into the state are engaged in interstate commerce between their states and the state of Washington, and, in a sense, may be said to be doing business in the state of Washington. But, if the contracts of sale are made in the states where the sellers reside, as they commonly are, they are not doing business in the state of Washington, in the sense that they are present here transacting business. They are doing that in the states of their residence. To put the matter in another way— no inference that a corporation is present in a state can be drawn from the bare fact that it is doing an extensive interstate commerce business with persons or firms in that state. Obviously, a nonresident of the state of Washington might carry on interstate commerce with residents of the state of Washington for an entire lifetime without ever being present in the state of Washington in person or by agent.

Furthermore, even if it should be established that the relator is doing business in this state, that would not, of itself, as the majority opinion seems to assume, make it suable here. The primary question in such a

case as this is: Is the relator present here for jurisdictional purposes? The fact that the relator is doing business here, if it be a fact, is merely evidentiary. It tends to prove that it is present for jurisdictional purposes, but it is by no means conclusive.

In *Consolidated Textile Corp. v. Gregory*, 289 U. S. 85, 77 L. Ed. 1047, 53 S. Ct. 529, the supreme court of the United States reaffirmed, by quotation, the rule which it had previously stated in *People's Tobacco Co. v. American Tobacco Co.*, 246 U. S. 79, 62 L. Ed. 587, 38 S. Ct. 233, Ann. Cas. 1918C, 537, in the following manner:

" 'The general rule deducible from all our decisions is that the business must be of such nature and character as to warrant the inference that the corporation has subjected itself to the local jurisdiction, and is by its duly authorized officers or agents present within the State or district where service is attempted.' "

And, in our own opinion, in *Macario v. Alaska Gastineau Mining Co.*, 96 Wash. 458, 165 Pac. 73, L. R. A. 1917E, 1152, it is conceded that the mining company did business in the state. The question before the court was properly stated as follows:

"Was the mining company doing business in this state to the extent that it became subject to the process of our courts in this action?"

If we substitute the word "relator" for the words "mining company" in the above question, we have an accurate statement of the first and principal question presented in this case.

The business of the relator is primarily that of advertising. It is from advertisers that it receives the bulk, if not the whole, of its business income. It carries on that business in the following manner: The advertisements of its clients are interspersed throughout other material which is appealingly instructive or entertain-

ing, and the whole is poured into a microphone. An independent contractor, the American Telegraph and Telephone Company, with which the relator has a contract for such service, then transmits the audio waves to more than one hundred radio stations located throughout the United States. These waves are delivered to those radio stations, which, having the facilities to do so, have contracted with the relator to do the work of distributing its messages through the air to the general public. When this has been done, the business of the relator has been fully accomplished. The majority hold that these facts warrant the inference that the relator subjects itself to the local jurisdiction of the various states in which it distributes its messages through the instrumentality of these independent contractors.

As I understand the opinion, the majority reach this conclusion by a course of reasoning which may be analyzed and broken down into the following steps: (1) The local station, in this case the Queen City Broadcasting Company, is the agent of the relator; (2) having received the audio waves, figuratively speaking, in bulk, it distributes them through the air; (3) the act of the agent is the act of the principal, or, to state it in the classic manner, *qui facit per alium facit per se;* (4) hence, the relator does business in this state; and (5) it must, therefore, be concluded that the relator is present here for jurisdictional purposes.

In my opinion, this course of reasoning is unsound in at least two particulars. I have already pointed out in a general way, and will show by citation of authority later in the opinion, that proposition (4) does not warrant the conclusion stated in (5); nor is (4) established by the preceding steps, for, obviously, the fiction that the act of the agent is the act of the

principal cannot possibly be applicable when the act in question is done by an independent contractor. It is only because it is his individual act, and not the act of the person who employed and procured him to do the act, that he *is* an independent contractor. But, conceding for the sake of argument that the Queen City Company is some sort of an agent of the relator, I would remind the majority that we are here dealing with a Federal question, and that the decisions of the Federal courts are, therefore, binding upon us, and that, in the case of *Bank of America v. Whitney Central Nat. Bank,* 261 U. S. 171, 67 L. Ed. 594, 43 S. Ct. 311, the supreme court has said, speaking through Mr. Justice Brandeis:

"The jurisdiction taken of foreign corporations, in the absence of statutory requirement or express consent, does not rest 'upon a fiction of constructive presence, like *qui facit per alium facit per se.* It flows from the fact that the corporation itself does business in the State or district in such a manner and to such an extent that its *actual* presence there is established." (Italics above and wherever found in this opinion are supplied.)

In *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U. S. 333, 69 L. Ed. 634, 45 S. Ct. 250, the supreme court of the United States, in holding that the defendant corporation was not present in a state for purposes of jurisdiction, refused to apply the fiction of identity, or *alter ego.* In that case, the Cudahy company, a Maine corporation, had organized a subsidiary corporation in Alabama. The plaintiff attempted to sue the parent company in Alabama by making service upon its subsidiary. In quashing the service, the court said, in part:

"The main question for decision is whether, at the time of the service of process, defendant was doing business within the State in such a manner and to such

an extent as to warrant the inference that it was present there. *Bank of America v. Whitney Central National Bank*, 261 U. S. 171. In order to show that it was, the plaintiff undertook to establish identity *pro hac vice* between the defendant and the Alabama corporation. The Alabama corporation, which has an office in North Carolina, is the instrumentality employed to market Cudahy products within the State; but it does not do so as defendant's agent. It buys from the defendant and sells to dealers. In fulfillment of such contracts to sell, goods packed by the defendant in Iowa are shipped direct to dealers; and from them the Alabama corporation collects the purchase price. *Through ownership of the entire capital stock and otherwise, the defendant dominates the Alabama corporation, immediately and completely; and exerts its control both commercially and financially in substantially the same way, and mainly through the same individuals, as it does over those selling branches or departments of its business not separately incorporated which are established to market the Cudahy products in other States. . . .*

"The defendant wanted to have business transactions with persons resident in North Carolina, but for reasons satisfactory to itself did not choose to enter the State in its corporate capacity. *It might have conducted such business through an independent agency without subjecting itself to the jurisdiction. Bank of America v. Whitney Central National Bank*, 261 U. S. 171."

I digress for the time being to point out the far-reaching consequences, or at any rate what I think must be the far-reaching consequences, of the reasoning of the Departmental majority, if it is adopted by a constitutional majority of the court. As I write, there lies on my desk a copy of the October 14th issue of a well-known weekly periodical. It has, in addition to its cover, one hundred and sixty pages of high grade paper, large pages, ten and five-eighths inches by twelve and five-eighths inches. The issue weighs

more than a pound. Thousands of copies of this periodical come into the state by mail, but many more thousands are delivered by auto trucks to drugstores, cigar stores, bookstores, and other retail outlets, before the opening of business every Wednesday morning. They are sold at five cents per copy.

It is apparent from the character and size of the periodical that this amount must represent only a trifling portion of the cost of its preparation and distribution. The great bulk of the income which makes it possible for its publisher to carry on the business must come from the advertising it carries. It is, therefore, fair to say that the foreign corporation which publishes the periodical is engaged in the advertising business. To get the advertisements of its clients to the public, it intersperses them among other material of a highly entertaining and instructive nature. Having prepared its message, it pours it into a printing press instead of a microphone, employs an express company instead of a telephone company to transmit it to other states, and, upon its arrival at its destination, a concern with which it has a contract to perform that service makes local delivery to the retail outlets.

The only difference, which I can see, between its business and that of the relators is occasioned by the fact that one conveys its message to the public consciousness through the eye, the other, through the ear. This being so, they must, of necessity, use different instrumentalities. The point, of course, which I wish to make is that, if the local broadcasting company which distributes for the relator is an agent, and its act is the relator's act, and the relator is, therefore, suable here, then the trucking company which distributes for the publishing company is its agent, and its act is the publishing company's act, and the publishing company is also suable here. As far as I am aware,

no one has hitherto supposed that the hundreds of publishing companies who distribute their publications in this manner all over the United States are suable in every state in the Union.

I am by no means sure that the consequences of the majority decision will stop at that point. If the Queen City Broadcasting Company is relator's agent, is not the American Telegraph and Telephone Company its agent also? And, is the relator not suable, according to the majority reasoning, in every state through which the telephone company carries the audio waves? I do not think that either the local broadcasting company or the telephone company are agents in the sense that they are representative of the relator. *Prima facie,* they are independent contractors. They may be properly spoken of as instrumentalities or agencies through which the relator performs its functions, but they are independent agencies.

The words "independent agencies" immediately suggest the case of *Bank of America v. Whitney Central Nat. Bank,* 261 U. S. 171, 67 L. Ed. 594, 43 S. Ct. 311, for, in the opinion in *Cannon Mfg. Co. v. Cudahy Packing Co., supra,* the court said, citing the *Bank of America* case as authority:

"It [the Cudahy Company] might have conducted such business through an independent agency without subjecting itself to the jurisdiction."

The Whitney Bank had its banking house and usual place of business at New Orleans, Louisiana. The Bank of America, a New York corporation, attempted to sue it in the Federal court for the southern district of New York. When the controversy reached the supreme court of the United States, it stated the question presented as follows:

"The sole question for decision is whether, at the time of the service of the process, defendant was doing

business within the district in such manner as to warrant the inference that it was *present* there."

Because I believe that this case *is* determinative of the instant case, I quote from it at considerable length:

"The facts relied upon to establish presence of the defendant within the district consist wholly of its relations to the Hanover National Bank and five other banks, whose places of business are located in New York, and of transactions conducted through them. Each of these six banks is, what is commonly called, a correspondent of the defendant. In each the Whitney Central carries continuously an active, regular deposit account. But its transactions with these banks are not limited to making deposits and drawing against them. *Superimposed upon the simple relation of bank and depositor are numerous other transactions which necessarily involve also the relationship of principal and agent.* These additional transactions conducted by the correspondent banks include: payment in New York of drafts drawn, with accompanying documents, against letters of credit issued by defendant at New Orleans; the receipt in New York from brokers and others of securities in which the Whitney Central or its depositors are interested, and the delivery of such securities; the making of payment to persons in New York for such securities; the holding of such securities on deposit in New York for long periods and arranging substitution of securities; the cashing, under specific instructions from defendant given in New Orleans, of checks drawn on it by third parties with whom it had no banking or deposit relations; the receipt in New York from third parties, with whom defendant apparently had no banking relations, of deposits of moneys for account of its customers.

"The Whitney Central had what would popularly be called a large New York business. The transactions were varied, important and extensive. But it had no place of business in New York. None of its officers or employees was resident there. Nor was this New York business attended to by any one of its officers or employees resident elsewhere. Its regular New York

business was transacted for it by its correspondents—the six independent New York banks. They, not the Whitney Central, were doing its business in New York. In this respect their relationship is comparable to that of a factor acting for an absent principal. The jurisdiction taken of foreign corporations, in the absence of statutory requirement or express consent, does not rest upon a fiction of constructive presence, like *qui facit per alium facit per se.* It flows from the fact that the corporation itself does business in the State or district in such a manner and to such an extent that its actual presence there is established. That the defendant was not in New York and, hence, was not found within the district is clear."

If I understand these quotations, the court holds (1) that the Whitney Bank did business in New York; (2) that it did so through the six banks; (3) that they were actually its agents (see italicized statement in the first of the two long paragraphs above quoted), but that jurisdiction in such cases cannot be rested on a fiction of constructive presence; and (4) that, since the Whitney Bank had no place of business in New York, none of its officers and employees resided there, and its New York business was not attended to by its officers and employees resident elsewhere, it was not present in New York for jurisdictional purposes.

In this case, it is admitted that the relator has no place of business in the state of Washington; that none of its officers or employees reside therein; and that its business in Washington, if any, is not attended to by its officers or employees resident elsewhere. Moreover, the relator keeps no bank deposit or other property in this state, and it is not shown or contended that the Queen City Company does anything for it in any way equivalent or comparable to, or resembling, the things done by the six banks for the Whitney Bank, such as paying its drafts, receiving securities

from brokers and paying for them, or holding securities on deposit and exchanging them for other securities, or cashing checks drawn on the relator for third parties, or receiving money from third parties for the relator's account. In fact, the Queen City Broadcasting Company does nothing in the state of Washington for the relator, nothing at all, except broadcasting the matter relayed to it through the telephone company, and this it does pursuant to contract and as an independent contractor, not as a representative agent. Clearly, the case for holding that the Whitney Bank was present in the southern district of New York for jurisdictional purposes was infinitely stronger than the case which is presented here for holding the relator present in the state of Washington for that purpose.

Even if it were established that the relator is present in the state for jurisdictional purposes, I would feel compelled to dissent from the majority opinion for another reason. Our service statute (Rem. Rev. Stat., § 226 [P. C. § 8438]) provides that:

"The summons shall be served by delivering a copy thereof, as follows: — . . .

"9. If the suit be against a foreign corporation . . . doing business within this state, to any agent, cashier or secretary thereof; . . ."

The majority hold that the service of the summons upon the Queen City Company was a good service on the relator. Obviously, the Queen City Company is not the cashier or secretary of the relator, nor do I think it is its agent; but, for the purpose of argument, and for that purpose only, I will again assume that some sort of agency relation exists. It seems somewhat surprising, in view of the general principles governing service of process, and particularly in view of the fact that the statute reads "any agent, cashier or secretary thereof," that this court did not hold, in its

former decisions construing the statute, that the word "agent," being coupled with "cashier or secretary," contemplated someone having powers comparable to those of a cashier or secretary of the corporation. It is clear, however, that the court was not influenced by this circumstance, and, as the majority point out, has given the word "agent" a very broad interpretation. But, nevertheless, the court, in its prior decisions, has stated some limitations, and has never, to my knowledge, gone to the lengths to which the majority go in this opinion.

The majority cite two decisions in discussing this phase of the case. In one of them, *Pacific Typesetting Co. v. I. T. U.*, 125 Wash. 273, 216 Pac. 358, 32 A. L. R. 767, it is held that the word "agent" cannot mean a mere servant or employee, and, in the other, *Barrett Mfg. Co. v. Kennedy*, 73 Wash. 503, 131 Pac. 1161, there is a further limitation. I quote from the opinion in that case:

"The next contention is that Edwards was not an agent within the meaning of the statute. Our statute, Rem. & Bal. Code, § 1828, provides that writs of garnishment may be served in the same manner as a summons. Section 226 provides that a summons shall be served by delivering a copy thereof as follows:

" 'If the suit be against a foreign corporation or non-resident joint stock company or association doing business within this state, to any agent, cashier or secretary thereof.'

"The record shows that Turner, the statutory agent, who was also the resident manager of the appellant, had gone to California; that the writs were served in the afternoon; that Turner returned to Seattle that evening after the service of the writs; that Edwards had sole charge of the appellant's warehouse in Seattle during his absence; that he shipped goods out of the warehouse as directed, and made out the shipping bills; that he received freight into the warehouse; that he checked the bills, and that he sold the appellant's goods

and solicited orders for its goods at list prices. Measured by the duties which Edwards performed, he was clearly an agent within the meaning of the statute. It is true that he was not a general agent, but the statute does not require that service in such cases shall be made upon a general or a managing agent; *it suffices if it is made upon 'any agent' with representative authority.* . . .

" 'The statute makes service on "any agent" of a foreign corporation sufficient. The statute, therefore, does not require that the agent shall be general, but is complied with by a service upon an agent having limited authority to represent his principal.' *In the Cottrell case* [83 Va. 512, 3 S. E. 123], *the court defined the term 'agent' as signifying 'any one who undertakes to transact some business affair for another by authority and on account of the latter, and to render an account of it.' "*

There is no intimation anywhere in the record that the Queen City Broadcasting Company had any authority to transact any kind of business for the relator, or to bind it in any kind of a transaction, no matter how trifling. It simply contracted to perform a service for the relator for a stipulated consideration. The Queen City Company is not even an employee of the relator. There is a total want of proof of any sort of "representative authority." The majority opinion, therefore, must be taken to go far beyond the cases therein cited, and to hold, in effect, that "any agent" is equivalent to any and every agent. In my opinion, the statute, so construed, is violative of constitutional requirements concerning due process.

The ideal of due process is direct personal service. From the very nature of the case, service upon a corporation can only be made upon an agent. But, in providing for substituted service, it is always the effort to reach some person who may be presumed to have the welfare of the corporation at heart. For that rea-

son, statutes generally designate the principal officers of the corporation. Our statutes as to services on domestic corporations designate the president or other head of the corporation, the secretary, cashier, or managing agent thereof; but, in case of a foreign corporation, since these officers are not likely to be found within the state, the statute designates "any agent, cashier or secretary thereof." The supreme court of the United States has strongly intimated that service on just "any agent" might not be due process, and I think it highly probable that, if the instant case were before it for decision, it would hold that the attempted service on the relator in this case by serving the summons on the Queen City Company, its agent, did not give jurisdiction.

A mutual life insurance company wrote policies in the state of Tennessee. By the statute of that state, it was provided that a foreign corporation might be served in any county by serving "any agent" found therein. An insured named Spratley died in Tennessee. The insurance company sent a man to the county of decedent's residence to investigate the claim. He was promptly served with summons in a suit against the insurance company. The company stoutly contended that the Tennessee statute providing for service on "any agent" was violative of due process. I quote from the final decision in the matter as reported in *Connecticut Mutual Life Ins. Co. v. Spratley,* 172 U. S. 602, 43 L. Ed. 569, 19 S. Ct. 308. It will be noted that the court assumes, as this court has hitherto held *(Barrett Mfg. Co. v. Kennedy, supra),* that the service agent must be *representative* in character.

"It is admitted that the person upon whom process was served was an agent of the company. *Was he sufficiently representative in his character?* He was sent into the State as such agent to investigate in regard to this very claim, and while there he was em-

powered to compromise it within certain stated terms, leaving him a certain discretion as to the amount. He was authorized to settle the claim for the amount of the reserve 'or thereabouts.' He did not leave his character as agent when he entered the State. On the contrary, it was as agent, and for the purpose of representing the company therein, that he entered the State, and as agent he was seeking a compromise of the claim by the authority of the company, and therein representing it. Why was he not such an agent as it would be proper to serve process upon? He had been appointed an agent by the company; his whole time and services were given to the company under an appointment made years previously; he received a salary from the company not dependent upon any particular service at any particular time. The company having issued policies upon the life of an individual who had died, and a claim having been made for payment in accordance with the terms of those policies, the company clothed him with authority to go into the State and in its behalf investigate the facts surrounding the claim, and authority was given him to compromise it upon terms which left to him discretion to some extent as to the amount of payment."

It will be further noted that the court expressed doubt as to whether service on "any agent" would constitute due process, and was at great pains to make it clear that it was not approving the Tennessee statute, literally interpreted.

"We are not called upon to decide upon the entire validity of this whole act. The Federal question with which we are now concerned is whether the court obtained jurisdiction to render judgment in the case against the company so that to enforce it would not be taking the property of the company without due process of law. *Even though we might be unprepared to say that a service of process upon 'any agent,' found within the county, as provided in the statute, would be sufficient in the case of a foreign corporation,* the question for us to decide is whether upon the facts of this case the service of process upon the person named

was a sufficient service to give jurisdiction to the court over this corporation. *If it were, there was due process of law, whatever we might think of the other provisions of the act in relation to the service upon any agent of a corporation,* no matter what character of agent the person might be. If the person upon whom process was served in this case was a proper agent of the company, *it is immaterial whether the statute of the State also permits a service to be made on some other character of agent which we might not think sufficiently representative to give the court jurisdiction over the corporation.* If the service be sufficient in this instance, the corporation could not herein raise the question whether it would be sufficient in some other and different case coming under the provision of the state statute."

In conclusion: I dissent from the opinion of the majority because (1) I do not think that the relator is subject to the process of our courts, and (2) even if I be mistaken in that, because the attempted service does not satisfy the requirements of due process. I, therefore, think the relator is entitled to the writ, for although it has a remedy by appeal, or can have, under the authority of *Matson v. Kennecott Mines Co.,* 103 Wash. 499, 175 Pac. 181, if it preserves its special appearance throughout, that remedy is not adequate. Furthermore, if, as I am firmly convinced, the very most that the plaintiff corporation can expect at the end of the long trail is a void judgment, it is to its interest also that the question presented be determined now.

The writ should be granted.